1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

11

MICHAEL SHAW, on behalf of himself
and others,

Case No. 1:21-cv-01084-KES-CDB

12

FINDINGS AND RECOMMENDATIONS TO
(1) DENY PLAINTIFF'S MOTION FOR CLASS
CERTIFICATION [Doc. 46], AND (2) DENY
ELITE'S MOTION TO STRIKE [Doc. 56]

Plaintiff,

13

14

v.

15

DAIFUKU SERVICES AMERICA
CORPORATION., et al.,[1]

(Docs. 46, 56)

16

**14-DAY DEADLINE**

Defendants.

17

18

19      Plaintiff Michael Shaw ("Plaintiff") filed suit against Elite Line Services, Inc. ("Elite" or

20  "Defendant"), Daifuku America Corporation, and Daifuku North America Holding Company

21  (collectively "Defendants"), for violations of California wage and hour laws.  (Doc. 1).

22      Pending before the Court is Plaintiff's motion for class certification, Elite's motion to

23  strike the declaration of Tyler Smith, the parties' oppositions, and replies.  (Docs. 46, 55-56, 59-

24  61).  The motions were referred to the undersigned for findings and recommendations.  (Docs. 48,

25  58).  The matter was submitted on the parties' written submissions without hearing or oral

26  argument.  (Doc. 62).  For the reasons explained herein, the Undersigned will recommend that

27

28
_____
      [1] On March 11, 2024, Elite (the sole remaining Defendant in this action) filed notice that
its name had changed to "Daifuku Services America Corporation."  (Doc. 63).

1   Defendant's motion to strike (Doc. 56) be DENIED and Plaintiff's motion for class certification

2   (Doc. 46) be DENIED.

3   **Procedural Background**

4           Plaintiff initiated this action with the filing of a complaint on July 12, 2021.  (Doc. 1).[2]

5   Plaintiff raises nine causes of action of behalf of himself and a putative class: (1) failure to pay

6   for all hours worked, (2) failure to pay minimum wages, (3) failure to pay overtime wages, (4)

7   failure to authorize and permit and/or make available meal and rest periods, (5) failure to

8   reimburse business expenditures, (6) failure to provide timely and accurate itemized wage

9   statements, (7) waiting time penalties, (8), failure to furnish Plaintiff's records, and (9) unlawful

10  business practices.  *Id.* (citing Cal. Labor Code §§ 201-204, 226, 226.7, 432, 512, 1182.11-

11  1182.12, 1194, 1197-1197.1, 1198.5, 2802, and Cal. Bus. & Prof. Code §§ 17200 *et seq.*).

12          On August 9, 2021, Defendants filed an answer to Plaintiff's complaint.  (Doc. 5).  On

13  January 24, 2022, the Court issued a preliminary scheduling order, which set a briefing schedule

14  for any class certification motion.  (Doc. 23).  Thereafter, the case schedule was amended twice to

15  permit additional time to conduct discovery and brief Plaintiff's class certification motion.  (Docs.

16  27-28, 45).

17          On April 6, 2023, the Court ordered Defendant to produce "the timekeeping data and

18  payroll data for a 50% sample of the relevant employees, in electronic format."  (Doc. 46-5 at ¶ 3)

19  (citing Doc. 39).  On April 21, 2023, Defendant emailed Plaintiff three Excel spreadsheets in

20  native format (i) "Sample Payroll"; (ii) "Sample Time 2017-2021"; and (iii) "Sample Time 2021-

21  2023."  *Id.* at ¶ 4,

22          On October 11, 2023, the parties jointly stipulated to dismissal of Defendants Daifuku

23  America Corporation and Daifuku North America Holding Company without prejudice.  (Docs.

24  43, 44).

25  
---

26          [2] In 2019, Defendant settled a proposed class action, *Prieto/Segura v. ELS, et al.*, Los
    Angeles County Superior Court, No. BC670048.  (Doc. 55-1 at ¶ 76).  The class definition was

27  "[a]ll non-exempt hourly paid persons employed by Defendant in California airports as
    technicians or other positions."  *Id.*  The class period was from July 23, 2013, to February 8,

28  2019.  *Id.*  On March 6, 2019, the California State Court entered a final judgment in the *Prieto*
    action.  (Doc. 55-1 at ¶ 77; Doc. 55-2 at 260-85).

On November 22, 2023, Plaintiff filed the instant motion to certify class.  (Doc. 46).  Plaintiff seeks to certify the following class and subclasses under Federal Rule of Civil Procedure 23(a) and 23(b)(3):

> "**Class**: All current and former, hourly, non-exempt employees of [Defendant] who worked in California at any time, during the period of July 2017, until the resolution of this action ('Class Period').
>
> **Security Check Subclass**: All Class members who worked at an Amazon facility during the Class Period.
>
> **Regular Rate Subclass**:  All Class members who were paid overtime and/or meal and rest break premiums as well as a non-discretionary premium payment during the same workweek during the Class Period."

(Doc. 46-1 at 8).  Plaintiff estimates the proposed class includes 523 individuals and the proposed subclasses exceed well over 40 each.  *Id*. at 23.  Plaintiff requests the Court appoint him as representative and Schneider Wallace Cottrell Konecky LLP as class counsel for the proposed class and subclasses.  (Doc. 46 at 3).

In support of the motion for class certification, Plaintiff attached, among other pleadings, a declaration of Tyler B. Smith, a paralegal with the law firm of Schneider Wallace Cottrell Konecky, LLP.  (Doc. 46-5).  Although Defendant thereafter moved *ex parte* to extend the time to conduct additional discovery – including with respect to deposing Mr. Smith, who according to Defendant had not properly been disclosed (Doc. 49) – Defendant withdrew its motion (Docs. 52, 54) and timely filed an opposition to Plaintiff's motion to certify class and objections to Mr. Smith's declaration.  (Doc. 55).  That same day, Defendant filed a motion to strike the declaration of Mr. Smith.  (Doc. 56).  Plaintiff filed an opposition to Defendant's motion to strike on January 5, 2024.  (Doc. 59).  On January 8, 2024, Plaintiff filed a reply in support of his motion to certify class, and Defendant filed a reply in support of its motion to strike on January 16, 2024.  (Docs. 60-61).

On March 11, 2024, Defendant filed a notice of name change.  (Doc. 63).  On March 12, 2024, Defendant filed a notice of new authority, to which Plaintiff replied.  (Docs. 64, 65).

**Factual Background**[3]

Defendant is a materials handling company and is a part of one of the largest airport service providers in the United States. (Doc. 1 at ¶ 16; Doc. 55-1 at ¶ 1). Defendant "maintains and services conveyance systems that its clients use to transport materials, including packages and luggage, among other items." (Doc. 55-1 at ¶ 1). Defendant provides its service throughout the United States, including the state of California. (Doc, 1 at ¶ 17). Defendant employs hundreds of hourly, non-exempt workers who work at Amazon and airport locations throughout California. (Doc. 1 at ¶¶ 17, 21; Doc. 55-1 at ¶ 2).

Defendant's workers generally have included, but are not limited to mechanics, engineers, technicians, material handlers and processors, apprentices, bag jammers, order fillers, field service coordinators, and other employees responsible for providing support, maintenance, repairs, and assistance for Defendant's operations and systems. (Doc. 1 at ¶¶ 17, 21). Defendant runs its operations up to 24-hours a day at Amazon and airport facilities with exact start times depending on the facility. (Doc. 55-1 at ¶ 18).

During the proposed class period, Defendant's non-exempt employees worked at thirteen different Amazon warehouses and four different airports (all varying sizes). *Id*. at ¶¶ 3, 9-10.[4] The number of employees who work at Amazon and airport facilities varies greatly. *Id*. at ¶¶ 5-6. Moreover, the number of employees at each facility who work on each shift varies. *Id*. at ¶ 12. The proposed class is composed of non-exempt employees with at least 30 different job titles with different job duties. *Id*. at ¶¶ 13, 15. Putative class members also include exempt managers during the same time frame. *Id*. at ¶ 16. "[E]mployees in the position of lead tech or a similar

---

[3] The facts relied upon for purposes of this motion only are derived from the Undersigned's review of Plaintiff's complaint and the parties' class certification briefing and evidence. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir, 2008) ("Although the district court's findings for the purpose of class certification are conclusive on that topic, they do not bind the fact-finder on the merits.").

[4] The Amazon facilities include Bakersfield (BFL1); Shafter (BFL2); Chatsworth (DAX3); City of Industry (DAX5); Torrance (DDO6); Culver City (DLX9); Valencia (DPS5); Simi Valley (DPS6); Redlands (LGB4); Jurupa Valley (ONT1); San Bernardino (SBD2); San Bernardino (SBD3); and Tracy (SJC7). The airport facilities are San Francisco (SFO); Sacramento (SMF); Los Angeles (LAX); and Long Beach (LGB). (Doc. 55-1 at ¶ 4).

1   position were responsible for supervising other proposed class members, including ensuring that

2   employees comply with wage and hour rules." *Id*. at ¶ 17.

3        Plaintiff was employed by Defendants for various projects as a mechanic in the Spring of

4   2020, in an Amazon facility in Bakersfield. (Doc. 1 at ¶¶ 5, 20; Doc. 46-6 at ¶ 2; Doc. 55-1 at ¶¶

5   78-79). Plaintiff never worked at Defendant's airport operations. (Doc. 55-1 at ¶ 80). Plaintiff's

6   formal title was Material Handling Technician II. (Doc. 55-1 at ¶ 78). Plaintiff's primary duties

7   included but were not limited to maintaining conveyor systems, installing and maintaining power

8   distribution systems, branch circuits, lighting systems, transformers, motor starters and relays,

9   and performing maintenance and repairs of ground support equipment and facilities. (Doc. 1 at ¶

10  20). Plaintiff was classified as an hourly, non-exempt employee and was paid an hourly rate of

11  $27.00. (Doc. 1 at ¶ 20; Doc. 46-6 at ¶ 2). At some point, Plaintiff received a work laptop and

12  walkie-talkie radio. (Doc. 55-1 at ¶ 81). Plaintiff resigned from his employment with Defendant

13  in February 2021. (Doc. 1 at ¶ 5; Doc. 55-1 at ¶ 85).

14       According to internal emails among Defendant's agents and Amazon staff, Defendant

15  identified certain discrepancies concerning time records and employee breaks in 2020 and 2021.

16  (Doc. 46-4 at 26-37, 53, 237). Plaintiff claims Defendant did not investigate these issues. *Id*. at

17  237, 251, 497. Plaintiff alleges that on March 12, 2021, he requested in writing that Defendant

18  provide him a copy of Plaintiff's personnel records pursuant to California Labor Code § 1198.5.

19  (Doc. 1 at ¶ 36). Plaintiff alleges Defendant failed to produce Plaintiff's employment records

20  within thirty days upon receipt of Plaintiff's written request, *i.e.*, on or before April 11, 2021. *Id*.

21       1.   Defendant's Meal Period and Rest Break Policies

22       At some point, Defendant posted the California Wage Orders in the third-party facilities

23  where its employees work in the areas that were designed for Defendant's employees. (Doc. 55-1

24  at ¶ 22). On January 1, 2017, Defendant issued a national employee handbook. *Id*. at ¶ 20. The

25  2017 handbook states: "Employees are entitled to a 30-minute unpaid break for meals during each

26  work period." (Doc. 46-4 at 14). The handbook also states that Defendant follows all applicable

27  state law. (Doc. 55-1 at ¶ 20).

28

1      In December 2020, Brooke Newman, a Senior Human Resources Business Partner

2   employed by Defendant (*see* Doc. 55-2 at 4 ¶ 4), noted meal penalties were not being accounted

3   for on employee timecards. (Doc. 46-4 at 50) ("The penalty part is NOT happening. I have not

4   seen it on any timecards.  This is a HUGE issue and puts the company and [*sic*] a major risk.").

5   In January 2020, Defendant issued a new national employee handbook.  (Doc. 55-1 at ¶ 20).  The

6   2020 handbook states "for [f]ive (5) consecutive hours or more worked," employees are entitled

7   to "one thirty (30) minute meal period."  (Doc. 46-4 at 21).

8      Employees may sign meal break waivers to voluntarily waive meal breaks for shifts under

9   six hours, and/or to voluntarily waive their second meal break if they work over ten but no more

10  than 12 hours.  (Doc. 55-1 at ¶ 32).  Plaintiff signed a written meal break waiver on January 15,

11  2021, in which he agreed to waive his first meal break.  *Id*. at ¶ 33.

12      2.   Employee Radios

13      Defendant issues radios to employees and requires them to carry these radios during their

14  shifts.  (Doc. 46-4 at 197, 261, 558-59, 569).  At airport facilities, Defendant's employees use

15  their radios to convey notifications regarding a bag jam, if there is a stoppage or contingency on a

16  system, and if an airplane cannot push off.  *Id*. at 572-73, 575.  Defendant expects radio

17  communications to be addressed within a certain number of minutes.  *Id*. at 573, 576, 578-79.

18  Employees could be disciplined for failing to promptly respond to the radio.  *Id*. at 230, 578-79.

19      Similarly, in the Amazon facilities, Defendant uses radios to call a "SEV" event—i.e.,

20  "essentially an emergency where part of the warehouse shuts down."  *Id*. at 227-28.  Class

21  members must address SEV events because it is a crucial matter that may put Defendant's

22  contracts with Amazon at risk.  *Id*. at 230.  Defendant does not have a formal policy for what

23  employees are supposed to do in the event of a SEV event while on a break.  *Id*. at 201, 235.

24  Likewise, Defendant has no formal written policy that requires employees to keep their radio on

25  and perform during a meal or rest break.  *Id*. at 201.

26      Plaintiff and certain Class members assert they were required to carry radios through

27  breaks, told managers their breaks were being interrupted by radio events, and that a lack of staff

28  and coverage required them to remain responsive during breaks.  (Doc. 46-2 at 6, 10-11, 15-16,

19-20, 27-28, 32-33, 37, 40-41, 45, 50, 54-55, 58, 63, 67-68, 73, 76-77, 80).  Plaintiff and these Class members also attest that they would be reprimanded, get in trouble with management, or otherwise face negative consequences if they did not respond to their radio.

Defendant asserts its managers are trained and expected to instruct employees (including non-exempt employees) to turn off their radios during their meal and rest breaks.  (Doc. 55-1 at ¶ 39).  Defendant asserts employees are not reprimanded for turning off their radios during meal or rest breaks.  *Id*. at ¶ 41.  Defendant also asserts if employees disregard the instruction to turn off their radio during meal and rest breaks, they know that they need not respond to radio calls during breaks.  *Id*. at ¶ 43.

At some point, Plaintiff was told by his manager to turn off his work radio during meal and rest breaks.  (Doc. 55-1 at ¶ 40).  Plaintiff testified that when he turned off his radio, "it ruffled a bunch of feathers" and he along with other employees were reprimanded.  (Doc. 46-4 at 856).  168:11-24. Thereafter, Plaintiff asserts he and other employees kept their radios on during breaks.  *Id*. at 963.

3.  Security Checks

Amazon imposes security checks on employees entering certain facilities to curb theft. (Doc. 46-4 at 167, 169-70); *see* (Doc. 55-1 at ¶¶ 48-49) (at SBD3, screenings are not conducted at any time because the warehouse only houses large items, and there is no realistic threat of theft). The security screening was conducted by Amazon employees or contractors hired by Amazon. *Id*. at ¶ 50; (Doc. 46-4 at 872).  Employees must pull anything out of their pockets and put their bags through an X-ray machine.  (Doc. 46-4 at 165).  Further, screened employees had to open up their company-issued laptops for review.  *Id*. at 130, 168, 821.  The length and time of the security screening can vary based on facility and time.  (Doc. 55-1 at ¶¶ 52, 54-55).  If an employee refused to go through a security check at an Amazon location, they might lose their clearance to work at that facility.  *Id*. at ¶ 59.

On or about April 13, 2021, Defendant issued retroactive payments to all non-exempt employees working at Amazon facilities in the amount of seven extra minutes of pay for each day worked from April 2017 to April 2021 to compensate for time spent undergoing security

screenings.  (Doc. 46-4 at 71-72, 180-81, 452, 454-56; Doc. 55-1 at ¶ 57).  Subsequently, Defendant implemented a new "seven-minute bonus rule" that automatically compensates each of its employees working at an Amazon facility seven minutes per day. (Doc. 46-4 at 74, 467-68, Doc. 55-1 at ¶ 56).  The seven-minute bonus rule is applied to all California non-exempt workers per workday for the Amazon locations. (Doc. 46-4 at 179, 468).

During his employment, Plaintiff was required to go through security and bag checks before clocking in.  (Doc. 46-6 at ¶ 4).  There were two check lines at the Bakersfield facility.  *Id.* at ¶ 6.  Plaintiff was also required to go through the same security and bag check after clocking out at the end of his shift.  *Id.* at ¶ 7.  If he wanted to leave the premises during a meal or rest break he would have to go through the same checks while exiting and reentering the facility.  *Id.* at ¶ 9.  Plaintiff estimates that it took, on average, approximately 10 to 30 minutes to go through a COVID-related temperature check (discussed *infra*) and a security bag check before he could clock in.  *Id.* at ¶ 5; *cf.* (Doc. 46-4 at 265:10-22) (Plaintiff's deposition testimony that on occasion the security check process took between five and eight minutes).  Plaintiff notes in April 2021, he received a check from Defendant in the amount of $586.04.  (Doc. 46-6 at ¶ 10).  Plaintiff does not recall being told by his supervisor that Defendant would retroactively compensate him for past time spent in security and temperature checks in the amount of seven minutes per shift.  *Id.*

Numerous putative Class members attest they were required to go through off-the-clock security/bag checks when entering and exiting Amazon facilities.  (Doc. 46-2 at 10, 19, 32, 40, 49, 62, 72).  These Class members estimate a temperature and security check could take from between two to 30 minutes.  *Id.*

4.  COVID-19 Temperature Checks

Between March 2020 and late-2021, many of Defendant's Amazon and airport facilities required workers to submit to COVID-19 temperature checks before entering the workplace. (Doc. 46-4 at 149, 155, 673; Doc. 55-1 at ¶ 60); *cf.* (Doc. 55-2 at 671) ("During the COVID-19 pandemic, at LAX, we never screened our employees for any temperature checks or any COVID-19 related checks at any time.").

During his employment, Plaintiff was required to go through temperature checks before clocking in. (Doc. 46-6 at ¶ 4). Plaintiff estimates that it took, on average, approximately 10 to 30 minutes to go through temperature and a security bag check before he could clock in. *Id*. at ¶ 5. Numerous putative Class members attest they were required to go through temperature checks before clocking in and were not paid for that time. (Doc. 46-2 at 10, 19, 32, 40, 49, 62, 72). These Class members estimate a temperature and security check could take from 2 to 30 minutes. *Id*.

At Amazon facilities, Amazon conducted the COVID-19 temperature screenings. (Doc. 55-1 at ¶ 61). Employees would walk under a laser in the ceiling that would check the employee's temperature. *Id*. at ¶ 62. Ms. Newman (a senior human resources officer with Defendant) testified the screenings "would take mere seconds to complete." (Doc. 55-2 at 4, 11). Ms. Newman also noted Defendant had not formally timed how long it took for an employee to go through a temperature check. (Doc. 46-4 at 164). According to Ms. Newman, the details "of how each COVID-19 check was conducted would depend on the particular County the Amazon facility was located in, as different localities had different requirements for COVID screenings." (Doc. 55-2 at 11).

At airport facilities that conducted screenings, temperature checks of Defendant's employees either were conducted by airport staff or self-conducted by the employees. (Doc. 55-1 at ¶¶ 64-66). Defendant was required to follow the contract it had with each airport and the requirements of various localities/counites regarding COVID-19 temperature checks. (Doc. 55-2 at 17). Defendant asserts it "has never received an employee complaint regarding how long it took to get through Amazon's COVID screening or COVID screenings at airports." (Doc. 55-1 at ¶ 63).

5.   Defendant's "Regular Rate"

It is Defendant's policy to pay shift premiums (i.e., non-discretionary additional payments). *See* (Doc. 55-2 at 478-79) (Defendant pays an additional 50 cents per hour to Amazon facility employees if they work a midshaft partially into the night and an additional dollar per hour if they work a night shift); (Doc. 46-4 at 632) (Plaintiff was provided additional

9

pay for shift premium work); (Doc. 46-4 at 633-34, 36) (Defendant also provides shift premiums for some airport facility employees).  According to Plaintiff's paralegal declarant (Mr. Smith), Defendant's "Sample Payroll' excel spreadsheet produced in discovery had "approximately 29,551 entries."  (Doc. 46-5 at ¶ 10).  Mr. Smith reviewed the spreadsheet and identified 19 instances of ten individuals receiving a meal premium payment and/or overtime that was based on an employee's base hourly rate, rather than the regular rate.  *Id*. at ¶ 12.

  6.   Defendant's Reimbursement Policy and Cellphones

  Plaintiff attests during his employment he was required to keep a cell phone on him at all times and respond at all times.  *See* (Doc. 46-6 at ¶¶ 11, 15) ("I do not recall being told by my supervisor that I should turn my Radio or cell phone off and/or not use my cell phone during meal breaks or rest breaks, or during the workday.").  Plaintiff estimates he spent approximately $40 a month for his cell phone costs, and his cell phone was used approximately 33.33% for work.  *Id*. at ¶ 18.  Defendant did not reimburse Plaintiff for any of his cell phone costs/expenses during his employment.  *Id*. at ¶ 19.

  Numerous putative Class members declare they had to use a phone for work-related communications and to clock in.  *See* (Doc. 46-2 at 6, 11, 15, 19, 27-28, 33, 41, 50, 54, 63, 68, 73, 76, 80).  Some of these Class members state they were told they "should" have their phone with them at all times.  *See generally id*.  These Class members do not recall being told to not use their cell phones during breaks or throughout the workday.  *Id*.  6, 11, 20, 27-28, 33, 41, 50, 54, 63, 68, 73, 76.  Some assert if they did not respond to cell phone messages or calls, they would get in trouble.  *Id*. at 6, 15, 27, 41, 50, 54, 73, 76, 80.  Others assert that sometimes they were even called on their cell phone on their off time. *Id*. at 19, 24, 68.  These Class members estimate they spent between $30 and $160 a month for personal cellphone costs, and their cell phones were used between 36% and 50% for work.  *Id*. at 6, 11, 15, 20, 28, 33, 41-42, 51, 55, 64, 69, 73, 77, 81.

  Defendant states its employees are not required to use their cell phones for work purposes. (Doc. 55-1 at ¶ 68).  Instead, some non-exempt employees are given company-issued cell phones. *Id*. at ¶ 69.  At Defendant's Amazon facilities, all employees are provided with laptops, radios, or

1   Amazon-owned cell phones.  *Id.* at ¶ 70.  Employees have access to the Chime, Slack, and

2   Microsoft Teams applications to communicate with other employees.  (Doc. 55-2 at 12).

3   Defendant asserts employees at Amazon facilities can clock in and out during their shift using

4   their laptops or a physical time clock depending on the location.  (Doc. 55-1 at ¶ 72).  Defendant

5   notes some employees choose to use their cell phones to clock in and out "due to their own belief

6   that it is more convenient to use a phone to clock in and out."  *Id.* at ¶ 73.

7   **Defendant's Request for Judicial Notice (Doc. 55-5)**

8       Fed. R. Evid. 201 permits a court to take judicial notice of any facts "generally known

9   within the trial court's territorial jurisdiction "or that "can be accurately and readily determined

10   from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  A

11   court "must take judicial notice if a party requests it and the court is supplied with the necessary

12   information."  Fed. R. Evid. 201(c); *Indemnity Corp v. Weisman*, 803 F.2d 500, 504 (9th Cir.

13   1986) (a court may take judicial notice of matters of public record outside the pleadings).

14       The Undersigned has considered Defendants' attached document titled "Order Granting

15   Plaintiffs' Motion for Final Approval of Class Action Settlement; Judgment" and "Stipulation and

16   Settlement of Class and Representative Action" in the matter of *Michael Prieto, et al., v. Elite*

17   *Line Services, Inc., et al.*, Los Angeles County Superior Court, Case Number BC670048.  (Doc.

18   55-2 at 252-85).  The documents pertain to a similar action filed in state court.  Therefore, this

19   Undersigned takes judicial notice of these documents.  *E.g., Reyn's Pasta Bella, LLC v. Visa*

20   *USA, Inc.*, 442 F.3d 741, 746, n.6 (9th Cir. 2006) (taking judicial notice of pleadings, memoranda,

21   and other court filings); *Burbank-GlendalePasadena Airport Auth. v. City of Burbank*, 136 F.3d

22   1360, 1364 (9th Cir. 1998) (taking judicial notice of pleadings filed in a related state court

23   action).

24   **Defendant's Evidentiary Objections (Doc. 55-3)**

25       Defendant makes several objections under the Federal Rules of Evidence to the

26   declaration of Paralegal Smith.  (Doc. 55-3) (citing Fed. R. Evid. 402, 403, 602, 701, 1002).  "In

27   determining whether class certification is appropriate under Rule 23, courts 'may consider all

28   material evidence submitted by the parties…and need not address the ultimate admissibility of

1   evidence proffered by the parties." *Blair v. CBE Grp., Inc.*, 309 F.R.D. 621, 627 (S.D. Cal. 2015)

2   (citations omitted).  In particular:

> Since a motion to certify class is a preliminary procedure, courts do not require strict adherence to the Federal Rules of Civil Procedure or the Federal Rules of Evidence.  S*ee Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178 (1974) (The class certification procedure "is not accompanied by the traditional rules and  procedures applicable to civil trials.").  At the certification stage, "the court makes no findings of fact or announces no ultimate conclusions on Plaintiffs' claims." *Alonzo v. Maximus, Inc.*, 275 F.R.D. 513, 519 (C.D. Cal. 2011) (quoting *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610, 616 (C.D. Cal. 2008)).  Therefore, the Court may consider inadmissible evidence at the class certification stage.  *Keilholtz v. Lennox Hearth Prods., Inc.*, 268 F.R.D. 330, 337 n.3 (N.D. Cal. 2010).  "The court need not address the ultimate admissibility of the parties' proffered exhibits, documents and testimony at this  stage, and may consider them where necessary for resolution of the [Motion for Class Certification]." *Alonzo*, 275 F.R.D. at 519.

12   *Gonzalez v. Millard Mall Servs., Inc.*, 281 F.R.D. 455, 459 (S.D. Cal. 2012).

13        In light of the "lenient evidentiary standard" that applies at this stage of the proceedings,

14   the Undersigned rejects Defendant's evidentiary objections. *Blair*, 309 F.R.D. at 627.

15   **Defendant's Motion to Strike (Doc. 56)**

16        As noted above, Plaintiff attached a declaration of Paralegal Smith in support of his

17   motion for class certification.  (Doc. 46-5).  Defendant seeks to strike the declaration in its

18   entirety.  (Doc. 56).  Defendant asserts the declaration lacks foundation under Federal Rules of

19   Evidence 602 and 901 and confuses the issues under Rule 403.  *Id*. at 6-8.  Defendant claims that

20   "[s]ince Smith provides no information regarding what he was calculating, and the actual

21   calculations show the opposite of Smith's implication, his testimony has no credence." *Id*. at 8.

22   Defendant contends courts may reject evidence if it is so undermined as to be incredible.  *Id*.

23   (citing cases).  Further, Defendant contends the declaration should be stricken because Plaintiff

24   refused to produce Smith for deposition *Id*. at 8-10.  Defendant asserts it has the due process right

25   to depose Smith.  *Id*.

26        The Undersigned finds that the Court of Appeals' decision in *Sali v. Corona Reg'l Med.*

27   *Ctr.*, 909 F.3d 996 (9th Cir. 2018) controls here.  At the class certification stage, evidentiary

28   objections on grounds of foundation go to the weight the court ascribes to the evidence, not to the

admissibility. *Id.* at 1005-07 (finding district court erred in striking spreadsheet on grounds similar to those advanced by Defendant here).  The cases Defendant cites predate *Sali* and are inapplicable to this action.  Under governing authorities, the court considers the evidentiary objections to the extent they raise issues that undermine the usefulness of the challenged evidence.  *See, e.g., Pascal v. Nissan N. Am., Inc.*, No. 8:20-cv-00492-JLS-JDE, 2023 WL 2558786, at *6 n.2 (C.D. Cal. Feb. 21, 2023) (declining to reject testimony "based on formalistic evidentiary objections" and instead considering substance of testimony in the light of evidentiary objections).

Mr. Smith should have been identified in supplemental Rule 26 initial disclosures and likely should have been made available for deposition.  Nevertheless, that alone is not a basis to strike the declaration.  *Heredia v. Sunrise Senior Living, LLC*, No. 8:18-cv-01974-JLS-JDE, 2021 WL 6104188, at *9 (C.D. Cal. Nov. 16, 2021) (acknowledging defendant did not have the opportunity to depose declarant, but noting such concern affects "only the weight afforded to Mr. Schroyer's calculations. Sunrise will have an opportunity to make any additional arguments at summary judgment and trial, as expert discovery has not closed.").

Striking Mr. Smith's declaration is further unwarranted given that Defendant should have sought (and, initially, did seek) to reopen discovery to take his deposition upon his belated disclosure.  *See* (Doc. 49).  Instead, it withdrew its request (Docs. 52, 54) and appears to have made a tactical decision by proceeding with its present request to strike the declaration.  *See Schmidtberger v. W. Ref. Retail*, No. 2:19-cv-04300-VAP (SKx), 2021 WL 5024714, at *3-4 (C.D. Cal. Sept. 28, 2021) (failure to seek to reopen discovery to depose declarant precludes exclusion of evidence sought to be stricken).  Defendant will not be unduly prejudiced by the Undersigned's consideration of Mr. Smith's declaration at this stage in the litigation.  S*ee id.* at *4 ("In any event, neither party demonstrates they have suffered undue prejudice in being forced to respond to the foregoing declarations. In fact, both parties respond to the testimony of each other's newly disclosed witnesses in their papers filed in support of, and in opposition to, the Motion for Class Certification. This suggests the late disclosure of these witnesses was harmless.").  Accordingly, the Undersigned recommends the motion to strike be DENIED.

1   **Legal Standard for Class Certification**

2   "Class actions have two primary purposes: (1) to accomplish judicial economy by

3   avoiding multiple suits, and (2) to protect rights of persons who might not be able to present

4   claims on an individual basis." *Longest v. Green Tree Servicing LLC*, 308 F.R.D. 310, 320 (C.D.

5   Cal. 2015). "Before certifying a class, the trial court must conduct a 'rigorous analysis' to

6   determine whether the party seeking certification has met the prerequisites of Rule 23." *In re*

7   *Seagate Technology LLC*, 326 F.R.D. 223, 239 (N.D. Cal. 2018) (quoting *Mazza v. Am. Honda*

8   *Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2011)).

9   The Court may certify a class only if: "(1) the class is so numerous that joinder of all

10   members is impracticable [numerosity requirement]; (2) there are questions of law or fact

11   common to the class [commonality requirement]; (3) the claims or defenses of the representative

12   parties are typical of the claims or defenses of the class [typicality requirement]; and (4) the

13   representative parties will fairly and adequately protect the interests of the class [adequacy

14   requirement]." Fed. R. Civ. P. 23(a). The purpose of these requirements is to "ensure[] that the

15   named plaintiffs are appropriate representatives of the class whose claims they wish to litigate,"

16   and to "effectively limit the class claims to those fairly encompassed by the named plaintiff's

17   claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotation marks

18   omitted).

19   In addition to these four requirements, the Court must find that at least one of the

20   following three conditions is satisfied: (1) the prosecution of separate actions would create a risk

21   of: (a) inconsistent or varying adjudications, or (b) individual adjudications dispositive of the

22   interests of other members not a party to those adjudications; (2) the party opposing the class has

23   acted or refused to act on grounds generally applicable to the class; or (3) questions of law or fact

24   common to the members of the class predominate over any questions affecting only individual

25   members, and a class action is superior to other available methods for the fair and efficient

26   adjudication of the controversy. Fed. R. Civ. P. 23(b).

27   "Rule 23 does not set forth a mere pleading standard. A party seeking class certification

28   must affirmatively demonstrate . . . compliance with the Rule[.]" *Dukes*, 564 U.S. at 350; *see*

*Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001) ("the party seeking certification . . . bears the burden of showing she has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)").  Rule 23 further provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues," Fed. R. Civ. P. 23(c)(4), or the "class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5).  "This means that each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action."  *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981).

A trial court has broad discretion to grant or deny a motion for class certification.  *See Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010).  The Court's class certification analysis "may 'entail some overlap with the merits of the plaintiff's underlying claim.'"  *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Dukes*, 564 U.S. at 351).  "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* at 466.

## I. Rule 23(a)

1. Numerosity

The first Rule 23(a) prerequisite is numerosity. Fed. R. Civ. P. 23(a)(1). To meet the numerosity requirement, the class must be "so numerous that joinder of all members is impracticable."  *Id*.  Numerosity does not impose a precise numerical threshold.  *Gen. Tel. Co. of the Northwest, Inc. v. E.E.O.C*, 446 U.S. 318, 330 (1980).  However, "[c]ourts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members."  *E.E.O.C. v. Kovacevich '5' Farms*, No. CV-F-06-165 OWW/TAG, 2007 WL 1174444, at *21 (E.D. Cal. Apr. 19, 2007).  *See, e.g., Cruz v. MM 879, Inc.*, 329 F.R.D. 639, 644 (E.D. Cal. Jan. 18, 2019) (certifying class of 181 employees alleging Labor Code claims).

A plaintiff must present evidence to satisfy the numerosity requirement. *See Dukes*, 564 U.S. at 350 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are in fact sufficiently numerous

15

1  parties ...."). A "failure to present evidence to show numerosity precludes class certification."

2  *Diacakis v. Comcast Corp.*, No. C 11-3002 SBA, 2013 WL 1878921, at *5 (N.D. Cal. May 3,

3  2013) (citing *Black Faculty Ass'n of Mesa College v. San Diego Cmty. College Dist.*, 664 F.2d

4  1153, 1157 (9th Cir. 1981)).

5       In his motion, Plaintiff asserts that the proposed Class includes approximately 523 current

6  and former employees. (Doc. 46-1 at 23). Plaintiff argues Defendant itself identified the Class

7  size when it compiled the Class members' contact information and provided the list to the notice

8  administrator for administration of a *Belaire-West* notice. *Id.* Additionally, Plaintiff contends

9  that based on the sample provided by Defendant of 50% of Class members' time and pay records,

10  the two subclasses exceed well over 40 each. *Id.*

11       Defendant does not oppose Plaintiff's assertion that the numerosity of the class and

12  subclasses has been satisfied. Therefore, except for the Regular Rate Subclass (discussed *infra* at

13  pp. 38-39), the Undersigned accepts Plaintiff's representations that the class and subclasses are

14  large and finds that the numerosity requirement is met. *E.g., Cruz*, 329 F.R.D. at 644 (certifying

15  class of 181 employees where defendants did not oppose plaintiffs' showing of numerosity).

16      2.  Commonality-Predominance

17       The second Rule 23(a) prerequisite (commonality) and the predominance requirement of

18  23(b)(3) ask whether the class members' interests are "sufficiently cohesive to warrant

19  adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). The

20  inquiry "logically entails two steps" – first, whether the issues in the case are individual or

21  common; and second, whether the common issues predominate over the individual issues.

22  Newberg on Class Actions § 4:50.

23       As for the first step, an individual issue is one where "the members of a proposed class

24  will need to present evidence that varies from member to member." *Tyson Foods, Inc. v.*

25  *Bouaphakeo*, 577 U.S. 442, 453 (2016) (citing Newberg on Class Actions § 4:50). By contrast, a

26  common issue is one either where "the same evidence will suffice for each member to make

27  prima facie showing," *id.*, or, similarly, where the issue is "susceptible to generalized, class-wide

28  proof." *In re Nassau County Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006).

1     Rule 23(a) "sometimes [requires] the court to probe behind the pleadings before coming to

2     rest on the certification question." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir.

3     2013) (quoting *Dukes*, 564 U.S. at 350). "[T]he merits of the class members substantive claims

4     are often highly relevant when determining whether to certify a class," and "a district court must

5     consider the merits" if they overlap with Rule 23(a)'s requirements. *Ellis v. Costco Wholesale*

6     *Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). As such, a court must resolve any factual disputes "to

7     determine whether there was a common pattern and practice that could affect the class as a

8     whole." *Id.* at 983 (emphasis original); *see Wang*, 737 F.3d at 544 (noting that even as to a class

9     consisting only of 200 members, "there are potentially significant differences among the class

10    members.").

11    As for the second step, common issues likely will not predominate if "a great deal of

12    individualized proof" would need to be introduced to address most or all of the elements of a

13    claim, *Gomez v. J. Jacobo Farm Labor Contr., Inc.*, 334 F.R.D. 234, 256 (E.D. Cal. 2019) (citing

14    *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004)), or "a number of individualized

15    legal points" would need to be established after common questions were resolved, *id.* (citing

16    *Klay*, 382 F.3d at 1255), or "the resolution of . . . [an] overarching common issue breaks down

17    into an unmanageable variety of individual legal and factual issues." *Id.* (quoting *Cooper v.*

18    *Southern Co.*, 390 F.3d 695, 722 (11th Cir. 2004)). By contrast, common questions likely will

19    predominate if "individual factual determinations can be accomplished using computer records,

20    clerical assistance, and objective criteria — thus rendering unnecessary an evidentiary hearing on

21    each claim," *id.* (citing *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 40 (1st

22    Cir. 2003)), or "when adding more plaintiffs to the class would minimally or not at all affect the

23    amount of evidence to be introduced." *Id.* (citing Newberg on Class Actions § 4:50). A finding

24    of predominance will generally not be defeated merely because there is a need to make

25    individualized damage determinations. *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 (9th

26    Cir. 2017); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

27

28

17

1    Plaintiff asserts commonality is satisfied here as the action challenges a system-wide

2    practice or policy that affects all of the class members.  Specifically, Plaintiff challenges the

3    following practices and policies:

4        (a) Plaintiff's meal and rest break claim based on Defendant's practice of retaining
         control over employees via radios and its policy of failing to recognize and
5        authorize second meal breaks; (b) Plaintiff's wage claim based on Defendant's
         security/bag and temperature check practices and practice of miscalculating regular
6        rate; (c) Plaintiff's reimbursement claim based on Defendant's reimbursement
         policy; and (d) Plaintiff's derivative claims based on the same practice/policy.
7

8    *Id.* at 24-34.  The Undersigned addresses below each claim in turn.

9    A. Plaintiff's meal and rest break claim based on Defendant's practice of retaining control

10   over employees via radios.

11   (a) Applicable Law

12   California law requires an employer to offer its employees certain meal breaks, which

13   may be unpaid: "An employer may not employ an employee for a work period of more than five

14   hours per day without providing the employee with a meal period of not less than 30 minutes."

15   Cal. Lab. Code § 512(a).  "An employer may not employ an employee for a work period of more

16   than ten hours per day without providing the employee with a second meal period of not less than

17   30 minutes."  *Id.*  The employer and employee may by mutual consent waive a first meal period

18   on workdays of up to six hours and the second meal period for workdays of up to twelve hours, if

19   the first meal was not waived.  *Id.*

20   The Wage Orders and California Labor Code § 226.7 also require an employer to permit

21   its employees to take rest breaks "at the rate of ten (10) minutes net rest time per four (4) hours or

22   major fraction thereof."  IWC Wage Order No. 5, Cal. Code Regs. tit. 8, § 11080(12)(A).  No rest

23   period is required for employees "whose total daily work time is less than three and one-half (3

24   1/2) hours."  *Id.*  An employee may recover one hour of pay for each day on which the employer

25   did not offer a compliant rest break.  *Id.* § 11080(12)(B).

26   An employer must only offer a break; it has no duty to "ensure that no work is done."

27   *Brinker Rest. Corp. v. Sup. Ct.*, 53 Cal. 4th 1004, 1017 (2012).  However, "an employer may not

28   undermine a formal policy of providing meal breaks by pressuring employees to perform their

duties in ways that omit breaks." *Id*. at 1040.  *See Brewer v. Gen. Nutrition Corp*., No. 11-CV-3587 YGR, 2014 WL 5877695, at \*7 (N.D. Cal. Nov. 12, 2014); *see also Alberts v. Aurora Behav. Health Care*, 241 Cal. App. 4th 388, 406 (2015) ("the mere existence of a lawful break policy will not defeat class certification in the face of actual contravening policies and practices that, as a practical matter, undermine the written policy and do not permit breaks."); *Campbell v. Vitran Express Inc*, No. CV 11-5029 RGK (SHX), 2015 WL 7176110, at \*4 (C.D. Cal. Nov. 12, 2015) ("[E]mployer cannot contravene an official meal or rest break policy by imposing an informal practice that impedes or discourages its employees from taking compliant breaks.") (citation omitted).

(b) The Parties' Positions

Plaintiff asserts that Defendant violated California's labor laws by engaging in a practice of retaining control over its employees during breaks via radios.  (Doc. 46-1 at 25-26.)  In support of his claim, Plaintiff cites to the California Supreme Court's decision in *Augustus v. ABM Sec. Servs. Inc.*, 2 Cal. 5th 257 (2016).  *Id*. at 25-26.  Plaintiff notes in *Augustus*, the defendant required its employees to "keep their pagers and radio phone on – even during rest periods – and to remain vigilant and responsive to calls when needs arose."  *Id*. at 25 (citing 2 Cal. 5th at 260).  The *Augustus* court held employees forced to remain on call, carry a device, or otherwise make arrangements so the employer can reach them during a break to fulfill certain duties, are obligations that are irreconcilable with an employee's retention of freedom to use meal and rest periods for their purposes.  *Id*. (citing 2 Cal. 5th at 269).

Plaintiff argues Defendant requires its employees to carry and be responsive to radio during their shifts, including their meal and rest periods.  *Id*. at 26.  Plaintiff claims the pressure imposed by Defendant on Class members to promptly respond to their radios "is rooted in the fact that [Defendant] has contracts with Amazon and airports that will be put at risk if [Defendant] does not promptly address issues that happen at the facilities."  *Id*.  Plaintiff contends Class members must immediately address orders and communications conveyed via radios, or "else they will be 'immediately reprimanded' and will face severe repercussions, including termination."  *Id*.

19

1        Defendant argues Plaintiff's reliance on *Augustus* is misplaced.  *Id*. at 16-17.  Defendant

2   asserts that it had no requirement or policy that its employees keep radios on during meal and rest

3   breaks.  *Id*.  Defendant argues "*Augustus* has no relevance here, as the key in *Augustus* was that

4   the employer's policy required all non-exempt employees to carry a device so they could be

5   reached during their breaks."  *Id*. at 17 (citing *Rodriguez v. Taco Bell Corp.*, 896 F.3d 952, 957

6   (9th Cir. 2018)).  Defendant claims the evidence demonstrates its policy requires employees to

7   keep their radios off during meal and rest breaks and that "this case does not fall within

8   *Augustus's* gambit."  *Id*.

9        Defendant acknowledges some of Plaintiff's Class declarants testify that they did not turn

10  their radios off during their breaks.  *Id*. at 18.  But Plaintiff asserts "just because these few

11  declarants voluntarily did not turn off their radios does not mean they were not permitted to take

12  complaint meal or rest breaks."  *Id*. (citing *Serrano v. Aerotek, Inc.*, 21 Cal. App. 5th 773, 780-81

13  (2018)).  Defendant claims it has communicated California's requirements to its employees, that

14  employees are to have duty-free breaks and that they must turn off their radios during breaks.  *Id*.

15  Defendant contends that "to determine whether an alleged violation took place," the Court would

16  need to analyze each and every putative class member's situation.  *Id*. at 18-19.

17       In reply, Plaintiff argues Defendant fails to substantiate its claim that Defendant required

18  all Class members to turn off their radios during breaks.  (Doc. 60 at 7).  Plaintiff argues

19  Defendant's reliance on a written policy in the document titled "Meal, Rest, and Recovery Period

20  Policy - California Non-Exempt Employees Only" (*see* Doc. 46-4 at 78-80; Doc. 55-2 at 165-68)

21  is misplaced.  (Doc. 60 at 7).  Plaintiff avers this document was not in existence for most of the

22  class period.  *Id*.  Instead, Plaintiff claims Defendant "had a different written meal and rest break

23  policy in 2020-2022 and that policy did not have a requirement that employees turn in or off their

24  [r]adios."  *Id*.  Plaintiff asserts even with a purported written policy in 2023, Defendant continued

25  to require employees to be responsive to radios through informal but common policy.  *Id*. at 7-8.

26       Next, Plaintiff argues the Court should not give significant credence to the testimony of

27  Defendant's Rule 30(b)(6) witness and declarations from current employees and supervisors.  *Id*.

28  at 8-9.  Plaintiff claims the testimony and declarations have a heightened potential for coercion

because of the ongoing employer-employee relationships. *Id.* Plaintiff asserts Defendant's Rule 30(b)(6) testimony lacks credibility because it is not corroborated by any contemporaneous documents that reference the requirement that employees were to turn off their radios during breaks. *Id.* at 9. Further, Plaintiff argues Defendant's Rule 30(b)(6) testimony represents a concession that it was common policy for employees to keep their radios on during breaks. *Id.* at 9-12.

Plaintiff admits that at one time, his supervisor told him to turn off his radio. *Id.* at 12. However, Plaintiff claims when he turned off his radio "it ruffled a bunch of feathers" and supervisors reprimanded Plaintiff and other employees – "What are you guys doing? There's a [SEV]." *Id.* (citation omitted). Thereafter, Plaintiff asserts he and other employees kept their radios on, including during breaks. *Id.*

(c) Analysis

The Undersigned finds that during the proposed Class period, Defendant had no formal written policy requiring employees to keep radios on and to be responsive to radio calls during meal and rest breaks. Instead, it appears that Plaintiff and at least some of Defendant's employees had an understanding of or followed an unwritten practice of allowing their breaks to be interrupted by radio calls. In particular, Plaintiff, through several witness declarations from non-exempt employees who are part of his proposed Class, presents some proof showing that some Class members may have been subject to an informal policy that required them to stay on call during breaks at risk of being disciplined for noncompliance.

When a plaintiff's claims are based on "allegations of a unwritten practice, as opposed to a written policy," the class members will often "have to prove individual elements in order to show [the defendant's] liability." *Mateo v. V.F. Corp.*, No. C 08–05313 CW, 2009 WL 3561539, at *6 (N.D. Cal. Oct. 27, 2009); *see Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 640 (N.D. Cal. 2010) (finding individual issues predominated when the plaintiff contended that the defendant's "restaurants in California followed a common unwritten policy of denying meal and rest breaks"); *Wren v. RGIS Inventory Specialists*, 256 F.R.D. 180, 208-09 (N.D. Cal. 2009) ("Because the Court finds that employees must be offered, but need not be forced to take a meal

1   break, the Court also concludes that many individualized inquiries will be necessary . . . to

2   determine the reason meal breaks were missed and whether they were waived.").  In order to

3   overcome this barrier to predominance, the plaintiff must allege specific facts, supported by

4   evidence, to show that the defendant's "informal policies of discouraging the taking of breaks

5   would likely be susceptible to common proof."  *Pina v. Con-Way Freight, Inc.*, No. C 10–00100

6   JW, 2012 WL 1278301, at *7 (N.D. Cal. Apr. 12, 2012).

7          Plaintiff's declarations filed in support of his motion for class certification come from

8   approximately 17 employees employed during the Class period at nine of Defendant's 17

9   Amazon and airport facilities.  *See* (Doc. 64-2).  As concerns radios, the majority of the

10  declarants state summarily they were "required" to keep radios on and to be responsive to radio

11  calls during their breaks.  With few exceptions, however, the declarants offer no further details or

12  explanation concerning that requirement.  Thus, for instance, the declarants do not attest whether

13  the requirement to keep radios on during meal breaks was based on a written policy that they

14  read, or a directive they received from a supervisor or information they learned from other

15  employees.  Moreover, the majority of the declarants do not attest that they were, in fact, subject

16  to discipline for violating any such radio policy, but rather, that they "would be reprimanded" if

17  they did not respond to radio calls during their breaks.  Again, in the vast majority of cases, these

18  declarants do not elaborate on why they thought they would be disciplined.

19         One of Defendant's employees attests to an incident during which a supervisor called the

20  employee back from a breakroom, told him "they couldn't afford downtime," and that the

21  employee "had to respond to calls on the Radio, that I had to keep the plant going and I had to

22  take care of the shop."  (Doc. 46-2, Ex. H, Declaration of Shapoor Kosarimehr).  Another

23  employee attests that supervisors "would get upset" if they did not respond to radio calls.  (*Id.*,

24  Ex. M, Declaration Carlos Soto).

25         In opposition to Plaintiff's motion for class certification, Defendant proffers declarations

26  of 17 other employees and supervisors who worked at eight of Defendant's Amazon and airport

27  locations during the Class period.  (Doc. 55-2).  Contrary to the 17 declarations submitted by

28  Plaintiff, the declarations submitted in opposition to class certification reflect the experiences of

employees and supervisors who attest they were not subject to any policy or practice of being required to keep radios on and to be responsive to radio calls during breaks.  Several of those employees attest to specific experiences where supervisors told them to not listen to their radios during breaks or where, once a supervisor learned an employee he or she sought was on break, found another employee to cover the task.  (*Id.*, Exs. U-1, U-13, U-15).  A number of these declarations also reflect a common experience where supervisors would find coverage for work assignments instead of calling upon employees on breaks.  (*Id.*, Exs. U-2, U-4, U-9, U-10, U-12, U-15, U-16).

Defendant's submission of declarations tending to show the absence of an unlawful unwritten policy, without more, "do[es] not preclude class certification."  *Alberts v. Aurora Behavioral Health Care*, 241 Cal. App. 4th 388, 409 (2015) (citing *Hall v. Rite Aid Corp.,* 226 Cal. App. 4th 278 (2014)) (noting that California courts repeatedly have found that a defendant employer's evidence of an inconsistent application of an illegal policy to be insufficient on its own to defeat class certification.).  Moreover, the Undersigned acknowledges under certain circumstances, skepticism of employer-proffered declarations in opposing class certification is warranted.  *See Nash v. Horizon Freight Sys.*, No. 19-cv-01883-VC, 2020 WL 7640878, at *1 (N.D. Cal. Dec. 23, 2020) ("Many courts have expressed skepticism about the use of these 'happy camper' declarations to defeat a motion for class certification in wage and hour cases"); *see also In re High-Tech Emple. Antitrust Litig.*, 289 F.R.D. 555, 576 (N.D. Cal. 2013) (the "Court is more persuaded by the internal, contemporaneous documents" rather than "Defendants' own employees' declarations, which were drafted specifically to oppose this Motion for Class Certification").

In sum, the parties present an equivalent amount of conflicting evidence as to practices at Defendants' facilities concerning any requirement that employees carry and respond to radio calls during breaks.  However, the Undersigned finds the employee declarations submitted by Defendant more compelling than those submitted by Plaintiff.  As noted above, Defendant's employee declarations are more detailed in offering specific anecdotes corroborating the employees' generally common experience that Defendant did not implement any practice

1   requiring employees to carry radios and respond to radio calls during breaks.  In contrast,

2   Plaintiff's employee declarations are conclusory and offer little to no details as to how or why the

3   employee believed he or she was required to respond to radio calls during breaks.  *See Ellis*, 657

4   F.3d at 982, 984 (explaining that a district court's "rigorous analysis" of Rule 23(a) criteria

5   implicates "judging the persuasiveness of the evidence presented" and resolving "critical factual

6   disputes").

7       When considered in the context of the undisputed fact that Defendant did not have a

8   written policy requiring employees to respond to radio calls during breaks and in the light of

9   Defendant's evidence suggesting there was no such unwritten practice commonly applied to Class

10  members, Plaintiff's evidence fails to demonstrate a uniform practice with respect to impeding or

11  discouraging proper first meal breaks.  *See Garcia v. Sun Pac. Farming Co-op, Inc*., 359 Fed.

12  Appx. 724, 726 (9th Cir. 2009) ("the conflicting employee declarations submitted by each party []

13  does not establish common wage and hour practices ... but rather the [in]consistent application of

14  the wage and hour laws") (quotations omitted); *Vega v. Delaware North Cos., Inc*., No. 1:19-cv-

15  00484-ADA-SAB, 2023 WL 6940198, at *39 (E.D. Cal. Oct. 20, 2023) (noting that conflicting

16  testimony as to unwritten policy of requiring carriage of radios during breaks "provides additional

17  weight favoring denial of class certification"); *Rojas-Cifuentes v. ACX Pac. Nw. Inc*., No.

18  214CV00697JAMCKD, 2018 WL 2264264, at *6 (E.D. Cal. May 17, 2018) ("showing that some

19  employees may have been deprived of an opportunity to take an uninterrupted meal break does

20  not amount to a 'policy and practice capable of determining [Defendants'] liability on a class-

21  wide basis.'") (quoting *Ordonez v. Radio Shack, Inc*., No. CV 10-7060-CAS (JCGx) 2013 WL

22  210223, at *7 (C.D. Cal. Jan. 17, 2013)).

23      Plaintiff has not proffered sufficient proof that the entire putative class suffered a common

24  injury relating to any policy or practice at Defendant's facilities of responding to radio calls

25  during breaks.  *Cf. Thomasson v. GC Servs. Ltd. P'ship*, 539 Fed. Appx. 809, 810 (9th Cir. 2013)

26  ("To satisfy commonality, there must be significant proof that the entire class suffered a common

27  injury.") (citing *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012)).

28

1    Therefore, the Undersigned concludes that Plaintiff has not satisfied the commonality and

2    predominance requirement for this claim.

3           B. Plaintiff's meal break claim based on Defendant's policy of failing to recognize and

4               authorize second meal breaks.

5           (a) The Parties' Positions

6           Plaintiff asserts Defendant's formal written policies failed to recognize Class members'

7    entitlement to second meal periods.  (Doc. 46-1 at 28-29).  Specifically, Plaintiff asserts

8    Defendant's 2017 and 2020 handbooks failed to recognize Class members' entitlement to second

9    meal breaks.  *Id*. at 17.

10          Defendant argues that by their own terms, the national handbooks expressly apply "except

11   as otherwise required by state…law," that the 2020 handbook had various standalone policies,

12   including a California-specific meal and rest break policy, and that "during all relevant times, [it]

13   has posted the California Wage Orders in the facilities where its employees work, to inform

14   employees of their rights to take meals and rest breaks."  (Doc. 55 at 20).  Defendant notes that

15   Plaintiff was aware of his entitlement to a second meal period since he signed a meal break

16   waiver form in January 2021, that addresses second meal breaks.  *Id*. at 21.

17          Defendant separately argues Plaintiff has not shown that "a purported illegal practice was

18   uniformly applied."  *Id*.  Defendant claims this case is on all-fours with the Ninth Circuit's

19   opinion in *Davidson v. O'Reilly Auto Enterprises, LLC,* 968 F.3d 955 (9th Cir. 2020).  *Id*.[5]

20   Specifically, Defendant contends even assuming the 2017 handbook's meal break policy was

21   imprecise (and ignoring the other California-specific policies and posted California wage orders),

22   "this policy does nothing to support Plaintiff's argument since he does not even argue the policy

23   was uniformly applied in an unlawful way."  *Id*.  Instead, Defendant claims it complied with

24   California's requirement to inform employees of their entitlements by posting the California

25

26          _____

                    [5] The Undersigned finds the *Davidson* decision is not aptly applied here.  In that case, it
27   does not appear the plaintiff seeking class certification presented evidence to the district court
     aside from an allegedly deficient written policy and his own declaration (968 F.3d at 967-68);
28   here, in contrast, Plaintiff presents additional evidence, including an analysis of time keeping
     records set forth in the Smith Declaration and declarations of putative class members.

1   Wage Orders and that Plaintiff provides insufficient evidence (specifically referencing the

2   declaration of Mr. Smith) to prove his claim.  *Id*. at 22.

3       Plaintiff argues his evidence, along with Defendant's expert's analysis, indicates that

4   Class members did not receive a timely or full second meal break.  (Doc. 60 at 13).  Plaintiff

5   avers Defendant's objection to the Smith Declaration is improper.  *Id*.  Plaintiff claims the issue is

6   not that the handbooks were "imprecise," rather, that the policy "affirmatively and incorrectly

7   stated that employees were entitled to only one meal break per shift."  *Id*. at 13-14.  Plaintiff

8   argues this was consistent with a pattern established by his proffered evidence demonstrating

9   Defendant did not recognize Class member's entitlement to second meal breaks.  *Id*. at 14.

10      Additionally, Plaintiff claims Defendant's arguments regarding second meal waiver

11  agreements are flawed.  *Id*. at n.13.  Plaintiff contends, "[w]hether Class members waived their

12  second meal breaks is a question subject to a common proof as 'an employer's assertion that an

13  employee [] waived a meal period 'is not an element that a plaintiff must disprove as part of the

14  plaintiff's case in chief.'"  *Id*.  Plaintiff states the assertion is an affirmative defense and the

15  burden is on the employer to plead and prove it.  *Id*. (citing *Donohue v. AMN Servs.*, LLC, 11 Cal.

16  5th 58, 74 (2021) and *Saechao v. Landry's Inc.*, No. C 15-00815 WHA, 2016 WL 1029479 (N.D.

17  Cal. Mar. 15, 2016)).  Plaintiff contends the validity of Defendant's waiver policies presents a

18  common legal question supporting certification.  *Id*.

19      (b) Analysis

20      Plaintiff has failed to show that common questions susceptible to resolution by class-wide

21  common proof exist as to the putative class's second meal period claim.  Defendant's 2017

22  handbook did not purport to exclude otherwise entitled employees from garnering a second meal

23  break given its "except as otherwise required by state…law" proviso.  Thus, Plaintiff is incorrect

24  to suggest that the 2017 policy misstates what the law requires (Doc. 60 at 10):  employees *are*

25  entitled to a 30-minute meal break after five or more hours of work – that statement is not

26  inconsistent with or to the exclusion of what the law provides with respect to a second meal break

27  for shifts that exceed ten hours.  Separately, the 2020 national handbook includes a California-

28  specific meal and rest break policy.  Moreover, Defendant posted the California Wage Orders in

the facilities where employees worked and informed employees of their right to take second meal breaks.  Indeed, Plaintiff was aware Defendant had a second meal break policy as he signed a meal break waiver form acknowledging an employee's entitlement to second meal breaks as provided for by law.  (Doc. 55-2 at 174).  The fact that employees may have missed second meal periods prior to 2020 does not constitute a *per se* violation.

While the parties' competing declarations examining a sampling of Defendant's timekeeping records demonstrate at least some facial non-compliance with second meal break requirements, the Undersigned concludes that the declaration submitted on behalf of Defendant (Doc. 55-2 at 24, Declaration of Stefan Boedeker) provides a more robust analysis than that set forth in Plaintiffs declaration of Mr. Smith.  In particular, Mr. Boedeker conducted a more extensive analysis of sampled records (*id.* at 26-27) that excluded from the universe of possible second meal break non-compliance those employees who received a premium payment, where such payment undermines a showing that Defendant implemented a universal policy of depriving eligible employees of a second meal break.  For the remaining portion of the potentially non-compliant universe of sampled employees, neither party's evidence excludes the possibility that those employees waived their second meal break as provided for by law, or otherwise voluntarily chose to not take a second meal break.

Nor do the declarations of putative class members submitted by Plaintiff in support of the motion for class certification suggest Defendant adopted a policy or practice of improperly depriving entitled employees of a second meal break.  Indeed, only four declarants even attest that they did not receive a second meal break – yet none of those declarants attests that (1) they were entitled to such a break, (2) whether, if entitled, they waived such break, or (3) whether they received a premium payment in lieu thereof or otherwise skipped a second meal break for personal reasons.  *See* (Doc. 46-2 at Exs. E. H, M, Q).  In light of this, determining whether any missed second meal break was attributable to an impermissible policy or practice by Defendant's agents to deprive employees of such entitlement would require an individualized inquiry as to why each employee failed to take a second meal break.  *See Ordonez* 2013 WL 210223, at *7 (evaluating second meal period claim and noting that "there is no way of determining on a

classwide basis whether these were violations, a legal conclusion, or whether individual class members voluntarily opted to start their meal break late, cut it short, or not take a break at all."). Accordingly, neither the commonality nor the predominance requirements are satisfied on Plaintiff's second meal period claim.

C. Plaintiff's wage claim based on Defendant's security/bag check practice.

(a) Applicable Law

Under California law, "employees [must] be compensated at the minimum wage for each hour worked." *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 323 (2005); Cal. Labor Code §§ 1182.11-12, 1194, 1197, & 11971.  "Hours worked" is defined as "the time during which an employee is subject to the control of an employer [] and includes all the time the employee is suffered or permitted to work, whether or not required to do so."  Cal. Code Regs., tit. 8 § 11040, subd. 2(H).  As long an employee is "subject to the control of the employer," such time is considered "hours worked" within the wage-order definition.  *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 582-85 (2000).  Off-the-clock checks and screenings constitute "employer-controlled activity" and are compensable as "hours worked."  *Frlekin v. Apple*, 8 Cal. 5th 1038, 1056, 1058 (2020).  However, "the mere fact that an employee must adhere to a third party's rules or policies in order to enter the workplace, without more, does not automatically impute such rules or policies onto the employer."  *Mejia v. Inglewood Sportservice, Inc.*, 2022 WL 3357656, at *5 (C.D. Cal. Aug. 15, 2022) (citing *Cazares v. Host Int'l, Inc*., No. 20-55803, 2021 WL 3667227, at *1 (9th Cir. Aug. 18, 2021)).

(b) The Parties' Positions

Plaintiff argues that throughout the Class period, Defendant uniformly required all members of the Security Check Subclass, to go through mandatory, off-the clock security checks every day.  (Doc. 46-1 at 30).  Plaintiff contends Class members estimate they had to spend 10-30 minutes going through each check, and the checks were performed for the benefit of Defendant, to curb theft.  *Id*.

Separately, Plaintiff notes starting around April 2021, Defendant purportedly began uniformly paying Security Check Subclass members for seven minutes in a "concession that

1   Defendant's security check practice involves a uniform practice whose legality can and should

2   readily be resolved on a class-wide basis." *Id.* Plaintiff claims Defendant has refused to disclose

3   the basis for their selection of seven minutes and cannot rely on this purported fact in their

4   defense. *Id.* at 31. Plaintiff asserts whether seven minutes sufficiently compensates Security

5   Check Subclass members is a damages question not pertinent to class certification. *Id.*

6        In opposition, Defendant argues Plaintiff cannot certify a Security Check Subclass for

7   several reasons. (Doc. 55 at 22). First, Defendant argues Plaintiff has not pointed to a policy by

8   Defendant that requires its employees at Amazon facilities to undergo security checks. *Id.* at 23.

9   Defendant asserts neither Plaintiff nor Class declarants testify that Defendant required them to

10  undergo security checks. *Id.* at 23-24. Instead, Defendant contends the evidence establishes that

11  the security checks were an Amazon policy and an Amazon requirement. *Id.* at 24.

12       Relatedly, Defendant argues it possessed no functional control over its employees during

13  security checks. *Id.* Defendant claims if an employee refused to go through a security check,

14  they might lose their clearance to work at an Amazon facility, but the employee could potentially

15  be hired to work at an airport facility. *Id.*

16       Separately, Defendant argues that even if it did have its own policy requiring some

17  employees to go through security checks at Amazon facilities, "certification would still be

18  improper since the evidence shows these checks did not occur at each Amazon facility at all

19  times." *Id.* at 24-25. Defendant notes several employees at Amazon facilities testified they have

20  never gone through security checks, because at some facilities, the products are large and not at

21  serious risk of theft. *Id.* at 25. Further, Defendant claims Plaintiff's evidence shows that the

22  checks that did occur varied widely in time and occurrence. *Id.* Defendant argues these

23  differences would require the Court to engage in an individualized inquiry into each Subclass

24  member's experience. *Id.*

25       Further Defendant contends it "automatically adds (and retroactively paid) seven minutes

26  of time each day to employees' pay to compensate for the fact that some employees may go

27  through Amazon's screenings, thus further complicating issues for Plaintiff." *Id.* at 26.

28  Defendant avers if screenings were under seven minutes, there would not be any entitlement to

1   wages or liability, as that time had been fully compensated.  *Id.*  Defendant argues this "creates an

2   additional individualized question" that makes certification inappropriate for the proposed

3   Security Check Subclass.  *Id.*

4        Plaintiff responds that the record evidence shows that Defendant jointly controlled and

5   required the security checks.  (Doc. 60 at 15).  Plaintiff argues "[i]rrespective of whether Amazon

6   required all persons working at the Amazon facilities to undergo a security check process before

7   leaving the facilities, there is no dispute that [Defendant] also required all Security Check

8   Subclass members to undergo the security check before leaving the facilities."  *Id.*  Thereafter,

9   Plaintiff highlights Defendant's role in security checks, that it was aware of the security check

10  process, it trained its employees on what to do for security checks, and that it benefited from the

11  security checks.  *Id.*

12       Plaintiff reiterates that Defendant's conclusion that each Security Check Subclass member

13  was owed seven minutes of extra pay from Defendant for the time workers spent in security

14  checks is a concession that Plaintiff's claim is amenable to class treatment.  *Id.*  Plaintiff asserts

15  whether seven minutes adequately captures the average time spent by Security Check Subclass

16  members in security checks is a factual dispute, capable of class-wide determination.  *Id.* at 16.

17       (c) Analysis

18       In *Frlekin*, the California Supreme Court held that when determining whether time spent

19  undergoing security checks is compensable, "the central question is whether the employee was

20  subject to the employer's control during those checks."  *Mejia*, 2022 WL 3357656, at *4 (citing

21  *Frlekin*, 8 Cal. 5th at 1047).

22       Under the *Frlekin* test, Defendant's argument that it had no "functional control over its

23  employees" while subject to Amazon's security checks and, thus, cannot be held liable for their

24  alleged uncompensated time spent completing such checks, is persuasive.  The factual context of

25  this case is similar to *Mejia v. Inglewood Sportservice, Inc.*, and the Undersigned adopts the

26  analytical approach used by the *Mejia* court as described below.

27       In *Mejia*, the plaintiff sued her employer (a food service and hospitality company) for its

28  failure to compensate her for the time she spent undergoing security checks at a concert venue.

2022 WL 3357656, at *1.  Although the nonparty concert venue solely executed the security checks pursuant to its security policy, the defendant-employer's policies recognized the venue's security check policy, directed employees to comply, and threatened discipline for any employee who refused to complete the security checks.  *Id.* at *2.  Applying the *Frlekin* test, the court found there was a disputed issue of fact as to whether defendant "controlled" plaintiff, relying largely on the fact that the defendant-employer's policy manual instructed its employees on how to comply with the venue's security checks and enforced compliance with the security checks through disciplinary measures.  *Id.* at *4, 6.

Here, in contrast to *Mejia*, Plaintiff offers no compelling evidence that Defendant's policy manuals either (1) required compliance with (or even acknowledged) Amazon or airport facility security check procedures, or (2) threatened discipline for refusal to undergo the security checks.  Plaintiff's assertions to the contrary (Doc. 60 at 15) are based on mischaracterizations of the deposition testimony of Ms. Newman (Defendant's senior human resources officer).  Thus, whereas Plaintiff cites Ms. Newman's testimony for the proposition that Defendant "jointly controlled" the security checks (*id.*), in fact, Ms. Newman merely testified that Defendant's employees did "go through" security checks but further elaborated that the checks (including processing through an X-ray scanner) were "an Amazon requirement" undertaken pursuant to an Amazon policy which she had not seen, could not access, and for which she was unfamiliar with the details.  (Doc. 46-4, Bylsma Decl., Ex. 15, Newman Dep. at 83-85, 89-90).

Plaintiff's argument that Defendant "benefited from the security checks" by receiving reports concerning thefts also is unconvincing.  Ms. Newman gave no testimony suggesting Amazon security teams reported to Defendant if its employees were found to have stolen Defendant's property; to the contrary, the security checks were implemented to deter theft of Amazon goods.  The only security check report Ms. Newman testified to receiving involved an employee who brought a steak knife (used as a lunch implement) through the security check.  *Id.* at 89-90. This is not the type of "benefit" under *Frlekin* that informs the analysis as to whether an employer exercises control over an employee.

1    Finally, unlike in *Mejia*, where the defendant-employer's policy manual provided for

2    discipline of employees who refused to complete security checks, here, Plaintiff fails to proffer

3    any similar policy or practice implemented by Defendant over Class members.  Disciplining

4    employees for *violating* a third-party's security policy (such as by bringing a steak knife to work)

5    is not the same as disciplining an employee for *refusing* to complete a security check (which

6    would demonstrate the disciplining authority's control over the employee in connection with the

7    execution of the security check).

8    Even if Plaintiff presented compelling evidence reflecting that, under *Frlekin*, Defendant

9    exercised sufficient control over the Class members to be liable for their time spent undergoing

10   the security checks, other evidence demonstrates not all members of Plaintiff's proposed subclass

11   underwent a security check.  For instance, the record shows not all Amazon facilities had security

12   checks. Several Amazon-side employees testified they went through a security check either

13   entering or exiting the facility.  Other Amazon-side employees offered no testimony regarding

14   security checks before the start of their shifts.  Some Amazon employees do not offer any

15   testimony regarding whether they had to go through security checks at any time.

16   In light of this evidence, the Court invariably would be called upon to engage in an

17   individualized determination of whether a proposed Class member even underwent a security

18   check. *E.g., Trevino v. Golden State FC LLC*, No. 1:18-cv-00120-ADA-BAM, 2023 WL

19   3687377, at *13 (E.D. Cal. May 26, 2023) ("The absence of a uniform policy consistently applied

20   throughout the class period across the variety of Amazon's facilities precludes resolution of

21   Plaintiffs' claims on a class-wide basis and a class cannot be certified based on exit screening

22   procedures.").  While Plaintiff may be correct that Defendant has conceded through its seven-

23   minute compensation/reimbursement scheme that at least *some* class members may be entitled to

24   compensation for time spent during entry or exit screens, any such concession does not satisfy

25   Plaintiff's burden to demonstrate common questions not reliant on individual proof predominate

26   to warrant class certification.

27   / / /

28   / / /

1      D. Plaintiff's wage claim based on Defendant's temperature check practice.

2          (a) Applicable Law

3          Time spent in COVID-19 screening is compensable hours worked under California law

4   where the employee adequately demonstrates that the employer required the screening, it took

5   place on the employer's property, compliance was mandated under threat of discipline, and the

6   employer was the primary beneficiary.  *Boone v. Amazon.com Services, LLC*, 562 F. Supp. 3d

7   1103, 1114 (E.D. Cal. 2022).

8          (b) The Parties' Positions

9          Plaintiff argues Defendant concedes it implemented a COVID-19 related temperature

10  check at both the Amazon and airport facilities.  (Doc. 46-1 at 32).  Plaintiff argues that based on

11  this common course of conduct, the claim should be certified.  *Id.*

12         Defendant asserts Plaintiff seeks to certify a class based on an "alleged 'check' that did

13  not consistently occur at all facilities."  (Doc. 55 at 26).  Like Amazon's security checks,

14  Defendant argues it was not responsible for the implementation of any COVID-19 screenings;

15  rather, Defendant maintains the COVID-19 temperature checks were either an Amazon or airport

16  policy.  *Id.*  Defendant avers because it did not have control of the policy, it cannot be held

17  responsible for paying such time.  *Id.* at 27.

18         Defendant further asserts that, even if the Court could find that it had some level of

19  control over employees' undertaking of temperature checks, the proposed class is still not

20  certifiable "since it is undisputed that not all proposed class members underwent these

21  temperature checks."  *Id.*  Defendant asserts temperature checks did not occur at all locations

22  during the entire proposed class period, there were no checks prior to March 2020, none after

23  later 2021, and at the height of the pandemic, some facilities did not even perform temperature

24  checks.  *Id.*  Moreover, Defendant argues that the temperature check practices in the Amazon and

25  airport facilities varied greatly.  *Id.* at 27-28.  Defendant contends "the only way to determine if

26  an employee suffered a Labor Code violation would be to interview each employee to see what he

27  or she remembers about any actual temperature checks during each [workday]."  *Id.*

28

Plaintiff argues "the record shows that [Defendant] required all Class members at both the Amazon facilities and the airport facilities to undergo a COVID-19 related temperature check each day before clocking in."  (Doc. 60 at 16).  Plaintiff notes Class members attest that they were required to go through these checks before clocking in and were not paid for that time.  *Id*. at 17.  Plaintiff asserts "[t]he common questions 'can be proven through the application of [Defendant's] policies, computer logs, timekeeping records, and payroll systems.'"  *Id*. (citation omitted).

(c) Analysis

In contrast to the conclusion reached with respect to security checks, the Undersigned finds that there is sufficient evidence to conclude that Defendant jointly required its employees at certain Amazon facilities to comply with Amazon's temperature check procedures and that Defendant's employees benefitted from the checks, such that Defendant satisfies the "control" inquiry under *Frlekin*.  Specifically, Ms. Newman testified that Defendant maintained a safety team supervised by a safety director that worked with Amazon in connection with its temperature checks.  (Doc. 46-4, Bylsma Decl., Ex. 15, Newman Dep. at 68-72).   Likewise, although temperature checks at airport facilities were largely or entirely the product of county- or airport-imposed policies (*id.*, Ex. 16, Andrews Dep. at 97), at least at some of those facilities, ELS staff monitored or implemented the temperature check such that a "joint control" finding is appropriate under *Frlekin*.  *Id.* at 70-71.

Nevertheless, the Undersigned finds Plaintiff's wage claim based on Defendant's involvement in or joint control over facility-implemented temperature checks does not satisfy the commonality requirement.  That is because the record demonstrates not all of Plaintiff's proposed Class members underwent temperature checks.  To begin with, there were no temperature checks prior to March 2020 and none after late-2021, and separately, some facilities did not perform temperature checks at all.  Moreover, the temperature check practices at the Amazon and airport locations varied greatly by facility and county.  These facts do not establish common policies and/or practices.  This lack of uniformity and the presentation of numerous permutations of temperature check procedures would require the Court to engage in analysis on an individual basis of the experiences of each Class member, rather than the proposed Class as a whole.

1          E. Plaintiff's wage claim based on Defendant's practice of miscalculating regular rate.

2          (a) Applicable Law

3          A non-exempt employee must be compensated at 1.5 times the employee's "regular rate

4    of pay" for overtime.  Cal. Lab. Code § 510.  "Significantly, an employee's 'regular rate of pay'

5    for purposes of Labor Code section 510 and the IWC wage orders is not the same as the

6    employee's straight time rate (i.e., his or her normal hourly wage rate)."  *Alvarado v. Dart*

7    *Container Corp. of Cal.*, 4 Cal. 5th 542, 554 (2018).  "Regular rate of pay, which can change

8    from pay period to pay period, includes adjustments to the straight time rate, reflecting, among

9    other things, shift differentials and the per-hour value of any non-hourly compensation the

10   employee has earned."  *Id*. Likewise, a non-exempt employee must be compensated at one

11   additional hour of pay at the employee's "regular rate of compensation" for each workday that a

12   meal period is not provided. Cal. Lab. Code § 226.7(c).

13         (b) The Parties' Positions

14         Plaintiff contends Defendant's records reflect that it routinely failed to incorporate shift

15   premium pay when calculating and paying overtime and/or meal premiums to members of the

16   Regular Rate Subclass.  (Doc. 46-1).

17         In response, Defendant presents expert evidence it argues demonstrates the regular rate of

18   pay does incorporate shift premiums.  (Doc. 55 at 28).  Defendant asserts Plaintiff's reliance on

19   the declaration of Mr. Smith (the paralegal who analyzed timekeeping records) is without merit.

20   *Id*.  Defendant avers the Smith Declaration shows a "paltry nineteen potential regular rate issues

21   (impacting only 10 out of over 500 proposed putative class members) over nearly 30,000 pay

22   periods, where 3,900 pay periods contain a shift premium payment."  *Id*.  Defendant argues the

23   Smith declaration fails to perform any calculations to show how the regular rate should have been

24   calculated in those 19 instances.  *Id*.  Defendant claims a 0.06% alleged violation rate does not

25   show a systematic practice that warrants class treatment.  *Id*. at 28-29.

26         Plaintiff counters, "[n]either Defendant in its Opposition nor Defendant's expert [] asserts

27   that [the numbers in Smith's Declaration] are inaccurate."  (Doc. 60 at 17).  Plaintiff argues the

28   Smith Declaration identifies 19 examples between 2020 to 2023 where Class members' meal

1    premium payment and/or overtime was based on the employee's base hourly rate, rather than the

2    regular rate.  *Id.*  Plaintiff argues under similar circumstances, courts regularly certify a regular

3    rate claim.  *Id.* (citing cases).

4          (c) Analysis

5          The Undersigned finds that Defendant's arguments largely attack the merits of Plaintiff's

6    claim – *e.g.*, whether, in fact, Defendant failed to properly calculate overtime and meal premium

7    payments based on "regular rate" as compared to base rates of pay – instead of whether any such

8    claims properly may be certified under Rule 23.  If Defendant failed to incorporate shift premium

9    pay when calculating and paying overtime and/or meal premiums as Plaintiff's evidence

10   preliminarily reflects, that injury could be common across the Class irrespective of location

11   worked, job, or time.  Unlike other claims discussed above for which individual proof and

12   analysis would significantly predominate over a common issue to be resolved, Plaintiff's "regular

13   rate" claim largely could be resolved based on common evidence of timekeeping records.  Similar

14   wage and hour issues have been determined to be the proper basis for class action litigation.  *E.g.,*

15   *Escano v. Kindred Healthcare Operating Co.*, No. CV 09-04778 DDP (CTx), 2013 WL 816146,

16   at *6 (C.D. Cal. Mar. 5, 2013) (certifying regular rate class for failure to include shift differentials

17   and bonus compensation in the regular rate calculation).

18        However, Plaintiff's wage claim based on Defendant's alleged miscalculation of the

19   applicable regular rate may not be certified for two separate and independent reasons.

20              (i)  Plaintiff Lacks Standing to Represent the Regular Rate Subclass

21        In order to have standing to represent a class, a named plaintiff must allege *and show* that

22   he personally has been injured by the practice that is challenged. *See Simon v. Eastern Ky.*

23   *Welfare Rights Org*., 426 U.S. 26, 40 n. 20 (1976) (named plaintiffs seeking to represent a class

24   must establish they have been injured by the allegedly offending practice, even where other class

25   members have been so injured).  "On a class certification motion, this means plaintiff must show

26   standing 'through evidentiary proof.'"  *Hoffman v. Blattner Energy, Inc.*, 315 F.R.D. 324, 332

27   (C.D. Cal. 2016) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)).

28

1    Here, the Smith Declaration identifies approximately ten named employees who

2   purportedly and improperly received overtime or premium payments at their base rate, instead of

3   the regular rate. (Doc. 46-16 at ¶ 12).   Those ten named employees do not include Plaintiff.   In

4   his own declaration, while Plaintiff makes various attestations regarding the alleged injuries he

5   suffered in connection with his other claims, he makes no attestations regarding any injury he

6   suffered on account of Defendant's alleged improper failure to pay him at the regular rate.   *See*

7   *generally* (Doc. 46-6).

8    Plaintiff presents other evidence that, at some unidentified time, he did receive a shift

9   premium payment.   *See* (Doc. 46-4, Bylsma Decl., Ex. 17, Andrews Dep. at 97-98).   In particular,

10   during her deposition, Ms. Andrews was presented with unidentified "paystubs" and identified a

11   code on one of these paystubs as demonstrating that Plaintiff received a $160 shift premium

12   payment.   *Id.*   However, Plaintiff presents nothing from Ms. Andrews' deposition testimony

13   establishing that any overtime or premium payment he received during that pay period was

14   incorrectly calculated at his straight rate (as opposed to his regular rate).

15    In his reply brief, Plaintiff cites a different record[6] – what is characterized as one of his

16   pay records "showing shift premium, but overtime paid at the 1.5 base rate" – to argue he suffered

17   a regular rate injury.   *See* (Doc. 60 at 18) (citing Doc. 46-4 at Ex. 12).   There are several problems

18   with this argument.   To begin with, it is based on a conclusory, one-sentence assertion made by

19   counsel in a reply brief and, thus, not answered by Defendant.   More fundamentally, no

20   knowledgeable witness attests that any entry in the cited record does, in fact, reflect payment of a

21   shift premium – it is an unsworn assertion made by counsel in an argumentative brief.   While an

22   entry in the cited record titled "Double Time (field 3)" reflecting 1.22 hours of pay at Plaintiff's

23   straight rate might constitute a shift premium, the Court can only speculate that is the case

24   because Plaintiff presents no competent evidence or testimony from a knowledgeable witness

25

26   _____

27    [6] During her deposition, the paystub Ms. Andrews identified as including a notation that
Plaintiff received a shift premium for an unidentified pay period was Bates stamped "ELS 44."

28   *See* (Doc. 46-4, Bylsma Decl., Ex. 17, Andrews Dep. at 97).   The apparent pay record referenced
in Plaintiff's reply brief is Bates stamped ELS 55.   *See* Bylsma Decl. ¶ 14.

1    establishing this as a fact.  Indeed, Defendant's evidence suggests that double overtime premium

2    payments are excluded from the regular rate calculation.  *See* (Doc. 55-2, Boedeker Decl., ¶ 15).

3    　　　　At bottom, Plaintiff fails to show that he ever received payment for overtime and/or meal

4    premiums that improperly failed to account for shift premium pay and deprived him of payment

5    at a higher regular rate.  Thus, because he has not presented evidence that he personally was

6    injured by this practice, he lacks standing to represent the proposed subclass alleging the regular

7    rate claim.  *See Flores v. Supervalue, Inc*., 509 Fed. Appx. 593, 594 (9th Cir. 2013) ("The district

8    court did not abuse its discretion in denying the motion for class certification of the overtime

9    compensation ('regular rate') subclass because Flores, having never been denied appropriate

10   overtime compensation, was not a member of that class and therefore did not have standing");

11   *Chavez v. AmeriGas Propane, Inc.*, No. CV 13-05813 MMM (MANx), 2015 WL 12859721, at

12   *18 (C.D. Cal. Feb. 11, 2015) ("Chavez does not have standing to represent the alternative CBA

13   rest period subclass. To represent the subclass, Chavez must show that he was personally injured

14   by the practice challenged.").

15   　　　　　　　(ii)  The Regular Rate Subclass Does Not Satisfy the Numerosity Requirement

16   　　　　Each subclass for which a plaintiff seeks certification must satisfy the numerosity

17   requirement.  *See Betts*, 659 F.2d at 1005.  "A plaintiff must present evidence to satisfy the

18   numerosity requirement."  *Barbosa v. Delta Packing Co. of Lodi, Inc.*, No., 2023 WL 5280009, at

19   *2 (E.D. Cal. Aug. 16, 2023) (citing. *Dukes*, 564 U.S. at 350.

20   　　　　"There is no hard and fast rule for determining whether a class is sufficiently numerous.

21   'The numerosity requirement is not tied to any fixed numerical threshold – it requires

22   examination of the specific facts of each case and imposes no absolute limitations.'" *Sarmiento v.*

23   *Sealy, Inc.*, No. 18-cv-01990-JST, 2020 WL 4458915, at *4 (N.D. Cal. May 27, 2020) (quoting

24   *Rannis v. Recchia*, 380 Fed. Appx. 646, 651 (9th Cir. 2010) (noting that a 20-member class,

25   though not precluded, would be a "jurisprudential rarity")) (internal quotation omitted); *cf. Harik*

26   *v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1051-52 (9th Cir. 2003) (noting a proposed class of 15 has

27   been held to be too small, but a class of more than sixty satisfies numerosity).  Where the exact

28

size of the subclass is unknown, the Court may rely on "common sense" deductions to determine whether numerosity is met. *Tucrios v. Carma Labs., Inc.*, 296 F.R.D. 638, 645 (C.D. Cal. 2014).

Here, as noted above, through examination of a 50% sampling of Defendant's timekeeping records, Plaintiff identified ten employees who *may* have suffered a regular rate injury. Based on this universe, it is reasonable to estimate that a 100% sampling of Defendant's timekeeping records would approximately double the number of impacted employees – from ten to 20.

Were the Undersigned to recommend certification of the overarching class, certifying a 20-member Regular Rate Subclass might serve the interests of judicial economy and warrant a finding that numerosity is met here. But given Plaintiff's failure to present any more compelling evidence regarding the likely size of the subclass, the Undersigned does not find that its membership is so numerous as to make joinder impractical, particularly given that members largely reside in the southern half of California and, thus, would not be required to spend substantial amounts of money and time away from home traveling to this District. *Cf. Mast, LLC v. Go 2 Transportation LLC*, No. CV-16-01022-PHX-ROS, 2018 WL 10419666, at *2-3 (D. Ariz. Apr. 2, 2018) (finding "unique characteristics" of a 35- to 40-member class supported finding the numerosity requirement met as members were "scattered across the country" and would spend "substantial periods of time away from home. In these circumstances, it would be inordinately difficult for each putative class member to be joined and participate directly in this litigation.") *with Marshall v. Bonded Adjustments Co.*, No. 11–CV–0022–TOR, 2012 WL 3044246, at *6-7 (E.D. Wash. July 25, 2012) (declining to certify 25-member class; finding, among other things, that the "lack of geographic dispersion of the putative class members weighs heavily against a finding that joinder is impracticable").

F. Plaintiff's reimbursement claim based on Defendant's reimbursement policy.

(a) Applicable Law

California Labor Code § 2802 provides that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of s or her duties." "To prove a violation of this section, a plaintiff must

demonstrate: (1) that he incurred expenses as an employee of the [d]efendant; (2) that those expenses were reasonably necessary to the discharge of his duties; and (3) that the employer did not reimburse the plaintiff." *Espinoza v. West Coast Tomato Growers, LLC*, No. 14-CV-2984 W (KSC), 2016 WL 4468175, at *4 (S.D. Cal. Aug. 24, 2016) (citing *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554 (2007)). "In addition, the employer 'must either know or have reason to know that the employee has incurred [the] expense.'" *Marr v. Bank of Am.*, No. C 09-05978 WHA, 2011 WL 845914, at *1 (N.D. Cal. Mar. 8, 2011) (quoting *Stuart v. RadioShack Corp.*, 641 F. Supp. 2d 901, 904 (N.D. Cal. 2009)). An employer must reimburse an employee for the reasonable expense of the required use of a personal cell phone. *Cochran v. Schwan's Home Service, Inc.*, 228 Cal. App. 1137, 1144 (2014).

(b) The Parties' Positions

Plaintiff claims Defendant knew or should have known that Class members were required to use their cell phones in connection with their work-related duties, including to communicate during shifts, and to clock in and out of locations that have no clock-in machines. (Doc. 46-1 at 33-34).

Defendant argues there is no basis to certify this claim, as Defendant's employees are not required to use their cell phones for work purposes. (Doc. 55 at 29). Defendant avers its employees are provided communication devices (or they have access to devices) that allow them to communicate with coworkers during the day and have no need to use their cell phones for any work-related reason. *Id.* Specifically, Defendant asserts at its "Amazon operations, all employees are provided with laptops, radios, or Amazon-owned cell phones so they can communicate with one another while on the job," and that at its airport facilities, employees are provided with radios or have access to office phones to communicate with one another during a shift. *Id.* Moreover, airport employees are not permitted to have cell phones in the airport for safety and security reasons based on federal regulations. *Id.*

Defendant relatedly asserts that its employees do not need a cell phone to record their time. *Id.* Defendant avers its employees at Amazon facilities can clock in and out using their laptops or physical time clocks depending on their location, while employees at the airport

40

1   facilities can only clock in and out using the time clocks.  *Id.*  Defendant contends Plaintiff has

2   not pointed to any written policy that requires employees to use their personal devices for work

3   purposes.  *Id.* at 30.  Further, Defendant points out that none of Plaintiff's class member

4   declarations filed in support of his motion establish that any manager or anyone employed by

5   Defendant told the employee to use his cell phone for work reasons.  *Id.*  Defendant argues the

6   Court would have to inquire into each employee's experience to determine whether there is in fact

7   a viable reimbursement claim.  *Id.*

8        In response, Plaintiff argues Defendant improperly attempts to inject a nonexistent factual

9   dispute to defeat certification of the reimbursement claim.  (Doc. 60 at 17).  Plaintiff notes

10   Defendant does not dispute that Class members used their cell phones for work-related

11   communications and duties.  *Id.*  Plaintiff contends Defendants argument does not "defeat

12   certification, rather, it demonstrates that this claim is amenable to class-wide resolution."  *Id.* at

13   18.

14        (c) Analysis

15        Plaintiff offers evidence that a number of employees are expected to use their cell phone

16   for work purposes (even on break) when called or they will be subject to consequences.  This

17   evidence suggests cell phones could be considered necessary expenditures for some members of

18   Plaintiff's proposed class. However, Plaintiff has failed to demonstrate these necessary

19   expenditures are common across his proposed class.  Plaintiff points to no formal policy that cell

20   phones are required for work purposes, which presents a significant obstacle to demonstrating

21   that a reimbursement claim may be subject to a predominating method of common proof.  *See*

22   *Howard v. Gap Inc*., No. C 06–06773 WHA, 2009 WL 3571984, at *4-5 (N.D. Cal. Oct. 29,

23   2009) (in the absence of a universal policy requiring class members to fund work-related

24   expenses, "[e]ach class member would have his or her own individual story to tell. This goes to

25   liability, not damages. Clearly, individual issues would overwhelm any common issues. This is a

26   show stopper.").  Moreover, employees are provided communication devices that allow them to

27   communicate with coworkers and clock-in.  And it is undisputed that for a portion of Plaintiff's

28   proposed class, a cellphone is not a necessary expenditure in an employee's discharge of his

1  duties.  Employees at airport locations are not allowed to bring their cell phones into the work

2  area due to safety and hazard concerns and government regulations.  Moreover, airport employees

3  can only clock in and out using time clocks.  Thus, Plaintiff cannot show commonality on this

4  claim for his proposed Class.

5    3.  Typicality

6     The third Rule 23(a) prerequisite is typicality.  Fed. R. Civ. P. 23(a)(3).  "[T]he claims or

7  defenses of the representative parties [must be] typical of the claims and defenses of the class."

8  Fed. R. Civ. P. 23(a)(3).  The representative and class need not be clones; rather, all that is

9  required is that the claims or defenses be "reasonably co-extensive."  *Hanlon v. Chrysler Corp.*,

10  150 F.3d 1011, 1020 (9th Cir. 1998) (noting that this standard is a "permissive" one and requires

11  only that the claims of the class representatives be "reasonably co-extensive with those of absent

12  class members; they need not be substantially identical"), overruled on other grounds by *Dukes*,

13  564 U.S. 338.  Typicality is satisfied if the representative's claims arise from the same course of

14  conduct as the class claims and are based on the same legal theory.  *See, e.g., Kayes v. Pac.*

15  *Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (claims are typical where named plaintiffs have

16  the same claims as other members of the class and are not subject to unique defenses).

17     Plaintiff contends typicality is satisfied because he worked as an hourly-paid, non-exempt

18  employee in California during the relevant period and was subject to the same policies and

19  practices as the class.  (Doc. 46-1 at 34).

20     In opposition, Defendant argues "there are numerous issues that make Plaintiff atypical

21  from the class that will distract from this litigation."  (Doc. 55 at 31).  Defendant argues Plaintiff

22  is atypical of the putative class members who worked at Defendant's airport operation.  *Id*.

23  Defendant's airport and Amazon employees did not overlap and Plaintiff testified he never

24  worked at Defendant's airport operation and does not know about its practices.  *Id*.  Defendant

25  asserts "[t]his is especially problematic because [Defendant's] Amazon operations are governed

26  by Amazon's rules and policies, while [Defendant's] airport operations are governed by rules and

27  policies set out by the federal government and airport authorities."  *Id*.

28

The Undersigned finds while there are relevant differences between Defendant's airport and Amazon facilities, the differences largely impacted only Plaintiff's security check, temperature check, and cell phone reimbursement claims – claims the Undersigned will not be recommending should be certified.  Plaintiff's remaining claims are not predominantly dependent on third parties' rules and policies, and thus, are typical of Class members throughout Amazon and airport facilities in California.

Defendant separately argues that Plaintiff is an atypical representative for many of the claims for which he seeks certification because Defendant has unique defenses to those claims. (Doc. 55 at 31).  Defendant notes a substantial portion of Plaintiff's motion is dedicated to his meal and rest break claim based on Defendant's purported requirement that employees keep their radio on during breaks.  *Id.*  Defendant contends Plaintiff is not typical for purposes of this claim as he testified that he received instruction and knew to keep his radio off during his meal and rest breaks.  *Id.* at 31-32.  Defendant asserts Plaintiff would not be entitled to a rest or meal break premium if he knew about Defendant's policy yet chose to ignore it and kept his radio on.  *Id.* at 32 (citing *Brinker Rest. Corp.*, 53 Cal. 4th at 1040-41).  However, as noted above, this does not render Plaintiff's claim atypical as he attests to facing backlash for turning his radio off and, thus, thereafter kept his radio on during meal and rest breaks along with other employees.

Defendant argues Plaintiff is atypical for his second meal break because the January 2017 handbook never applied to him.  (Doc. 55 at 32).  Specifically, Defendant claims "the January 2017 handbook never applied to his employment as it was superseded by the January 2020 handbook by the time he started his employment in May 2020."  *Id.* (citing Doc. 55-1 at ¶ 20). Plaintiff does not address this fact in his reply.  The Court agrees with Defendant that Plaintiff's second meal break claim is not typical of the claim asserted on behalf of the class.

Defendant argues Plaintiff is atypical of his regular rate claim because "Plaintiff offers no evidence that his regular rate of pay was miscalculated when he worked a shift premium."  (Doc. 55 at 32).  As set forth above, the Court agrees Plaintiff failed to proffer sufficient and compelling proof that he suffered a regular rate injury.  Thus, as to that claim, the Undersigned finds Plaintiff's is atypical.

1    4.   Adequacy of Representation

2         The final Rule 23(a) prerequisite is adequacy of representation.  Fed. R. Civ. P. 23(a)(4).

3    "[T]he representative parties [must] fairly and adequately protect the interests of the class."  *Id.*

4    In determining whether that requirement is met, the Court asks two questions: (1) do the

5    representative plaintiff and his counsel have any conflicts of interest with other class members;

6    and (2) will the representative plaintiff and his counsel prosecute the action vigorously on behalf

7    of the class.  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citing *Hanlon*, 150 F.3d at

8    1020).

9         Plaintiff asserts he will adequately represent the class.  (Doc. 46-1 at 35); *see* (Doc. 46-6

10   at ¶ 20) ("To my knowledge, there are no conflicts existing between my interests in this lawsuit

11   and the interests of the class members that would impair my ability to serve as representative of

12   the class.").  Plaintiff claims he demonstrated he is willing and able to vigorously prosecute this

13   litigation.  (Doc. 46-1 at 35).  Specifically, Plaintiff states, among other things, that he has

14   reviewed documents from counsel, responded to discovery requests, been deposed, and assisted in

15   the preparation of various legal documents.  (Doc. 46-6 at ¶ 21).  Plaintiff claims he has not been

16   promised and does not expect to receive compensation for acting as the representative of the class

17   other than any damages or compensation as a member of the class that might be awarded by the

18   Court.  *Id.* at ¶ 22.

19        Defendant argues Plaintiff is not an adequate representative, as he did not experience

20   many of the alleged violations he now claims exist.  (Doc. 55 at 32-33).  Thereafter, Defendant

21   reasserts the arguments it made in connection with the argued atypicality of Plaintiff's claims.  *Id.*

22   at 33.  In reply, Plaintiff argues that "the factual record directly contradicts Defendant's erroneous

23   assertion that Plaintiff is inadequate because he 'did not experience' the violations underlying this

24   action."  (Doc. 60 at 18).  Further, Plaintiff asserts Defendant's concerns about "conflicts within

25   the class" are disingenuous.  *Id.* At n.17.  Plaintiff claims there is no indication that supervisors do

26   not share the same interests as other class members.  *Id.*  Plaintiff argues, if needed, conflicts can

27   easily be addressed by the Court by modification.  *Id.*

28

1    Next, Plaintiff argues counsel for Plaintiff is well qualified to represent the Class, as

2   counsel has extensive experience in the prosecution of wage and hour class actions.  (Doc. 46-1 at

3   35) (citing Doc. 46-3 at ¶¶4-9).

4    In response, Defendant claims counsel for Plaintiff is inadequate to serve as Class Counsel

5   as she failed to take discovery.  (Doc. 55 at 33).  Specifically, Defendant claims the record

6   demonstrates Plaintiff was dilatory in conducting discovery, abused the *ex parte* application

7   process to seek more time for discovery, and failed to conduct any further discovery.  *Id*. at 33-34.

8   Defendant argues counsel for Plaintiff's failures cut against class certification.  *Id*. at 33 (citing

9   *Motty v, First Student, Inc.*, No. 2:15-cv-7463-ODW (E), 2016 WL 4498452, at *4 (C.D. Cal.

10  Aug. 26, 2016)).  In reply, Plaintiff argues "Defendant's own opposition papers – relying on

11  approximately 588 pages of the discovery record – demonstrate the absurdity of Defendant's

12  argument that Plaintiff's counsel failed to engage in adequate discovery."  (Doc. 60 at 18-19).

13   The Undersigned finds that Plaintiff and the proposed Class Counsel could serve as

14  adequate representatives as to any viable class-wide claims.  First, the record demonstrates

15  Plaintiff and Counsel have been diligent in pursuing this action since its filing.  The Undersigned

16  has no reason to doubt their commitment to resolving this dispute, and Counsel's assertion they

17  are experienced class action litigators.  Next, based on the evidence presented it does appear

18  Plaintiff and Counsel were diligent in pursuing discovery.  Defendant's concerns Plaintiff is not

19  an adequate representative, as he did not experience many of the alleged violations he now claims

20  exist, which have already been addressed above.

21   Defendant also argues Counsel for Plaintiff cannot serve as Class Counsel because of the

22  conflicts that exist in the Class.  (Doc. 55 at 34).  Defendant asserts "[s]ome proposed class

23  members at both Amazon and airport facilities supervised other proposed class members during

24  the class period, meaning they were responsible for ensuring others received their meal and rest

25  breaks and complied with other relevant wage and hour laws."  *Id*.  Defendant claims this fact

26  creates a conflict for Plaintiff's counsel, as they cannot represent the putative class member

27  employees if their managerial practices will be challenged.  *Id*. (citing cases).  But Plaintiff

28  correctly points out there is no indication that the supervisors do not share the same interests as

1   other class members in achieving the maximum recovery for the Class.  Any potential conflicts

2   could be addressed by the Court in appropriate modification to any class or subclass definitions or

3   other aspects of any certification order.

4       Accordingly, the Undersigned finds that Plaintiff and counsel are adequate representatives

5   for any viable claims.

6   **II. Rule 23(b)**

7       If a class satisfies the prerequisites of 23(a), the party seeking certification must also

8   demonstrate that the action is appropriate under Rule 23(b).  *Amchem Prods*, 521 U.S. at 614.

9   Here, Plaintiff contends the proposed classes meet the requirements of Rule 23(b)(3). (Doc. 43-1

10  at 31-34.)

11      Federal Rule of Civil Procedure 23(b)(3) requires a finding that (1) "the questions of law

12  or fact common to class members predominate over any questions affecting only individual

13  members," and (2) "a class action is superior to other available methods for fairly and efficiently

14  adjudicating the controversy."  As stated above, the Undersigned finds Plaintiff fails to

15  demonstrate predominance with respect to the asserted class claim given the invariable need to

16  resort to individual inquiries to assess those claims.   Accordingly, the Undersigned cannot find

17  that Plaintiff meets his burden of satisfying the superiority inquiry.  *See Zinser,* 253 F.3d at 1192

18  ("If each class member has to litigate numerous and substantial separate issues to establish his or

19  her right to recover individually a class action is not superior.").

20  **III. Plaintiff's derivative claims.**

21      Plaintiff contends his remaining claims, failure to provide timely and accurate itemized

22  wage statements, waiting time penalties, failure to furnish Plaintiff's records, and unlawful

23  business practices, are derivative of the underlying claims addressed above.  (Doc. 46-1 at 34).

24  Plaintiff asserts his derivative claims should be certified to the same extent as his underlying

25  claims.  *Id.*  Defendant argues because there are no common questions to any of Plaintiff's core

26  claims, certification is not proper on derivative claims.  (Doc. 55 at n. 5).

27      Because the Undersigned finds Plaintiff's principal class claims are not suitable for

28  certification, the Undersigned likewise will recommend that Plaintiff's motion for class

certification be denied as to his derivative claims.  *E.g., Chavez*, 2015 WL 12859721, at *29

(noting that derivative class claims "stand or fall" with the claims from which they derive).

**Conclusion and Recommendations**

For the reasons discussed above, the Undersigned finds Plaintiff has failed to establish by

a preponderance of the evidence that the requirements of Rule 23(a) and Rule 23(b)(3) are met.

Accordingly, it is HEREBY RECOMMENDED that:

1.  Defendant's motion to strike (Doc. 56) be DENIED;

2.  Defendant's evidentiary objections (Doc. 55-3) be DENIED; and

3.  Plaintiff's motion for class certification (Doc. 46) be DENIED.

These findings and recommendations will be submitted to the United States District Judge

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within 14 days after

being served with these findings and recommendations, Plaintiff may file written objections with

the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and

Recommendations."  Plaintiff is advised that failure to file objections within the specified time

may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir.

2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **April 9, 2024**

UNITED STATES MAGISTRATE JUDGE

47